Warren K. **HUNTZINGER** and Nancy J. Huntzinger, Plaintiffs–Appellants,

v.

**HASTINGS MUTUAL INSURANCE COMPANY, Defendant–Appellee.**

No. 96–4163.

United States Court of Appeals, Seventh Circuit.

Argued May 14, 1997.

Decided April 28, 1998.

George Plews, Jeffrey Featherstun (argued), Plews, Shadley, Racher & Braun, Indianapolis, IN, for Plaintiffs–Appellants.

Mark R. Smith (argued), Smith & Bemenderfer, Indianapolis, IN, for Defendant–Appellee.

Before CUMMINGS, COFFEY and DIANE P. WOOD, Circuit Judges.

COFFEY, Circuit Judge.

Plaintiffs-appellants, Warren K. Huntzinger and Nancy J. Huntzinger ("the Huntzingers"), sought a declaratory judgment in federal district court on the question of whether their insurer, the defendant-appellee herein, Hastings Mutual Insurance Company ("Hastings"), owed a duty to defend and indemnify them in an action arising out of their alleged maintenance of a solid waste dump site on property they sold to Crossman Communities, Inc. ("Crossman"). The parties filed cross-motions for summary judgment. The court denied the Huntzingers' motion and entered summary judgment in Hastings' favor, finding that the policy's "owned-property" exclusion barred coverage. The Huntzingers appeal. We affirm.

## I. BACKGROUND

On August 28, 1978, Warren Huntzinger, an Indiana resident, purchased approximately twenty-five acres of land in Pendleton, Indiana, which he subsequently transferred to his wife, Nancy Huntzinger ("Nancy"), also an Indiana resident. On March 8, 1993, Nancy executed a purchase agreement for the sale of the property to Crossman, a real estate development company whose expressed intention was to construct single-family detached homes on the site in accordance with plans prepared by the Huntzingers.[1] Among the various provisions contained in the purchase agreement were the two paragraphs set forth below, whereby Nancy warranted and represented to Crossman that the land complied with all applicable environmental laws, ordinances and regulations:

> Seller represents that, to the best of Seller's knowledge and belief, the Real Estate complies with all applicable laws, ordinances and regulations of all applicable governmental authorities, including, without limitation, those relating to health, environmental matters, hazardous waste, radon emission, toxic materials, and zoning matters.
>
> * * * * * *
>
> The representations, warranties, covenants, agreements and indemnities ... shall, for purposes of enforcement only, remain operative and shall survive the closing and the execution and delivery of the deeds and other documents conveying title....

The agreement further provided that the Huntzingers, "at their expense ... obtain an acceptable Environmental Site Assessment on the Real Estate." Accordingly, the appellants retained ATEC Associates, Inc. ("ATEC"), an environmental consulting firm, to conduct the assessment. In a letter dated April 15, 1993, ATEC notified the Huntzingers that, from 1892 through 1898, the Indiana Window Glass Company operated a facility in the northeast corner of the property and that, while the Company's physical plant had since been demolished, debris consisting of red bricks, fire bricks and glass shards remained scattered about the area. The report also noted the existence of a small pit, roughly three feet deep, located in the same vicinity as the debris. Even though the Huntzingers had knowledge of this information, they failed to disclose it and closed the deal with Crossman on June 3, 1993.

Exactly one year later, on June 3, 1994, Crossman filed a two-count complaint against the Huntzingers[2] in the Superior Court of Madison, Indiana, alleging that:

---

1. We assume that the land was available for residential development, and if not, that appropriate zoning arrangements would be made to allow for the construction of single-family homes on the site.

2. Crossman's complaint named both Huntzingers as defendants on the basis that Nancy Huntzinger acted as her husband's agent at all relevant times. Unless otherwise indicated herein, we will not differentiate between Nancy and Warren Huntzinger when discussing matters like

12. Subsequent to the Closing, Plaintiff discovered an unpermitted solid waste dump site on the Real Estate, in violation of Indiana Code 13–7–4–1 and Indiana Regulations 329 IAC 2–4–2 and 329 IAC 4–4–4.

13. Defendant Warren K. Huntzinger directed the burial of the solid waste on the Real Estate. Defendant Nancy J. Huntzinger knew, or should have known, that solid waste was buried on the site at the time of the execution of the Purchase Agreement.

14. The establishment and maintenance of such solid waste dump site on the Real Estate by the Defendants constitutes a breach of the representations and warranties of the Purchase Agreement.

15. The Defendants knew, or should have known, that the establishment and maintenance of such solid waste dump on the Real Estate constituted a violation of the law and a breach of the representation and warranties of the Purchase Agreement.

\*　　\*　　\*　　\*　　\*　　\*

19. By reason of the breach of the representations and warranties ..., Plaintiff has a set-off against the debt owing to Defendant Nancy J. Huntzinger in the amount of at least One Hundred Nine Thousand Four Hundred Eighty–Four and 08/100 Dollars ($109,484.08).

Crossman sought an unspecified amount of damages for the costs associated with disposing of the solid waste, remediating the property, its lost business and goodwill, damage to its reputation, and reasonable attorney's fees.

From December 16, 1988, through December 16, 1994, the span of time during which Crossman filed its suit, the Huntzingers carried their comprehensive general liability ("CGL") insurance with Hastings, a Michigan corporation. This policy specified the types of injuries and injury causes for which Hastings would provide coverage, to wit:

who owned the property prior to its sale or who established and maintained the solid waste

**COVERAGE A—FARM AND PERSONAL LIABILITY**

We pay, up to our limit of liability, all sums for which any **insured** is legally liable because of **bodily injury** or **property damage** caused by an **occurrence** to which this coverage applies.

We will defend any suit seeking damages, provided the suit resulted from **bodily injury** or **property damage** not excluded under this coverage.

(boldface in original). The insurance contract also expressly barred coverage for certain liabilities by way of exclusionary terms, two of which, commonly known as "owned-property" and "pollution" exclusions, provided:

**Exclusions That Apply Only to Farm and Personal Liability**—This policy does not cover liability:

\*　　\*　　\*　　\*　　\*　　\*

**d.** For damage to property owned by any insured.

\*　　\*　　\*　　\*　　\*　　\*

**f.** Resulting from the actual, alleged or threatened discharge, dispersal, release or escape of **pollutants** ....

(boldface in original). The Huntzingers, relying on the above "Farm and Personal Liability" provision, requested that Hastings defend them in the Crossman action. In response thereto, Hastings examined the allegations in Crossman's complaint and compared them with the language of the Huntzingers' insurance policy, only to conclude and inform the Huntzingers, in a letter dated May 13, 1994, that "there is no coverage for this claim" because: (1) the Crossman suit did "not originate from an 'occurrence' as defined by your [the Huntzingers'] policy"; (2) "[e]ven if the events complained of by [Crossman] did constitute an 'occurrence' ..., it is clear that these events took place outside the period during which you were insured by Hastings ...."; (3) the policy "exclude[s] coverage for liability arising from the actual, alleged or threatened discharge, dispersal, release or escape of pollu-

dump.

tants"; and (4) the "policy does not cover liability 'resulting from premises owned, rented or controlled by an insured other than the insured premises.'" The Huntzingers settled with Crossman for $30,000.00 on December 14, 1994, and thereafter petitioned Hastings to reconsider its earlier decision to deny them coverage. Hastings did not deviate from its earlier position expressed in its letter of May 13, 1994, and again maintained that it had no obligation to defend and/ or indemnify the Huntzingers.

In the wake of these events, the Huntzingers, asserting diversity jurisdiction under 28 U.S.C. § 1332, sought a declaratory judgment in federal district court, claiming that Hastings was obligated to indemnify them for the $51,424.26 expense they incurred in settling the Crossman suit, an amount equalling the total of the $30,000 settlement, plus $21,424.26 in attorney's fees. Both parties subsequently filed motions for summary judgment. Hastings argued that the Huntzingers were not entitled to indemnification since the Crossman complaint failed to allege an "occurrence" which caused "property damage," and even if such were not the case, that the owned-property and the pollution exclusions nevertheless acted to bar coverage. The Huntzingers, on the other hand, contended that the Crossman complaint did in fact allege "property damage" caused by an "occurrence," that the pollution exclusion was "absolute" and, therefore, ambiguous, *see American States Ins. Co. v. Kiger*, 662 N.E.2d 945 (Ind.1996) (holding that an "absolute" pollution exclusion is ambiguous and, therefore, must be construed against the insurer), and that the "owned-property" exclusion was inapplicable because "the Crossman Complaint arose over one year after the Huntzingers had already sold the property to Crossman."[3] The trial court granted Has-

tings' motion for summary judgment, and denied the Huntzingers'. The judge found that the Crossman complaint set forth allegations coming within the parameters of the terms "occurrence" and "property damage," as defined under the policy, but opined that insofar as "[t]he relevant date is the date of any alleged property damage, not the date a suit is filed ... [t]his case falls squarely within the owned property exclusion." (Mem. & Ord., at 15 (citation omitted)).[4]

## II. ISSUES

This appeal presents us with two issues. Initially, we consider whether the Huntzingers have waived any of the arguments they now advance against the applicability of the owned-property exclusion by having failed to raise them before the district court. And second, we shall determine whether the trial court properly concluded that the "owned-property" exclusion set forth within the Huntzinger's insurance policy precludes coverage on Crossman's underlying suit, brought in 1994, for the costs associated with remediating property it had purchased from the appellants in 1993.

## III. DISCUSSION

Our review of the district court's disposition of this case on cross-motions for summary judgment is conducted de novo, as it would be pursuant to any summary judgment determination. *See I.A.E., Inc. v. Shaver*, 74 F.3d 768, 774 (7th Cir.1996) (citing *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir.), *appeal dismissed and cert. denied*, 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 72 (1983)). Summary judgment is appropriate only "if the pleadings, depositions, answers to inter-

---

**3.** The Huntzingers' motion also claimed that the Crossman complaint triggered an endorsement to the policy which obligated Hastings to extend "personal injury coverage ... for any one or more of the following offenses: ... c. invasion of privacy, wrongful eviction or wrongful entry." The Huntzingers argued that this endorsement applied because the Crossman complaint sounded in nuisance and trespass. They further contended that under Indiana law, environmental liability claims against the insured trigger personal injury liability coverage, and relied on *Riv-*

*erside Oil, Inc. v. Federated Mut. Ins. Co.*, No. 94–2038, 1994 WL 904293, at *5 (C.D.Ill. Aug.19, 1994) (applying Indiana law), for the proposition that Indiana regards pollution as a wrongful entry.

**4.** The court held that the Crossman complaint failed to trigger personal injury liability coverage, and never reached the pollution exclusion question. Neither party raises either of these two issues on appeal.

rogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). We construe the evidence and all reasonable inferences that can be drawn therefrom in the light most favorable to the party against whom the motion is made, the Huntzingers. *See Voigt,* 700 F.2d at 349 (citing *Pharo v. Smith,* 621 F.2d 656, 664 (5th Cir.1980), *remanded on reh'g on other grounds,* 625 F.2d 1226 (5th Cir.1980)).

### A. Waiver of Arguments not Presented to the District Court

■ The Huntzingers proffered five arguments to the trial court as to why Hastings was obliged to indemnify them for the costs they incurred in defending, and ultimately settling, the Crossman suit. Hastings submits that, of the three arguments the Huntzingers now raise on appeal, two of them were not among those five advanced for the district judge's consideration. And, of course, "[i]t is axiomatic that an issue not first presented to the district court may not be raised before the appellate court as a ground for reversal." *Christmas v. Sanders,* 759 F.2d 1284, 1291 (7th Cir.1985) (citations omitted). Thus, in an effort to "maintain[ ] the efficiency, fairness, and integrity of the judicial system for all parties," *Boyers v. Texaco Ref. & Mktg., Inc.,* 848 F.2d 809, 812 (7th Cir.1998) (explaining the justification for the waiver rule), we must determine, as a preliminary matter, whether the Huntzingers have preserved their present arguments for appellate review.

■ We begin our waiver analysis by determining exactly what it is that the Huntzingers are arguing before us. As just noted, their attack on the district court's order appears to be three-fold. Initially, they contend that the underlying Crossman complaint

set forth an allegation that contamination of the property at issue posed a risk of imminent environmental harm to third-parties, and go on to cite a litany of authorities from this Circuit and other jurisdictions for the proposition that an "owned property" exclusion does not bar coverage in such a circumstance. *See, e.g., Patz v. St. Paul Fire and Marine Ins. Co.,* 15 F.3d 699, 705 (7th Cir. 1994) (owned property exclusion inapplicable where appellants sought "to recover the cost of the liability that the Department of Natural Resources imposed on them for maintaining a nuisance."); *Joslyn Mfg. Co. v. Liberty Mut. Ins. Co.,* 23 F.3d 1212 (7th Cir.1994); *Riverside Oil Inc.,* No. 94–2038, 1994 WL 904293 (C.D.Ill. Aug.19, 1994); *Anderson Dev. Co. v. Travelers Indem. Co.,* 49 F.3d 1128, 1133 (6th Cir.1995); *Gerrish Corp. v. Universal Underwriters Ins. Co.,* 947 F.2d 1023, 1030–31 (2d Cir.1991).[5] Next, the Huntzingers contend that, insofar as the "owned-property" exclusion conflicts with other policy provisions, it is ambiguous and must be construed against the insurer, Hastings. And finally, they assert that the owned-property exclusion is inapplicable since they did not own the property when Crossman brought its action against them in 1994. The first and second of these arguments stand in sharp contrast with those which the Huntzingers raised before the trial court. There, the appellants' sole contention with respect to the owned-property exclusion was that they were no longer the owners of the disputed parcel of land when Crossman filed its complaint, and "in cases involving allegations of environmental contamination . . . the 'owned property' exclusion does not apply to property which the policyholder has already sold." In other words, the Huntzingers asserted that the sale of the property was *the* critical fact that rendered the owned-property exclusion inapplicable.

We think it is clear that the Huntzingers are asking us to consider arguments on appeal which were not raised in the district court, and as such, they are waived.[6] While

**5.** Of the many cases on which the Huntzingers now rely, they brought only one, *Riverside Oil, Inc.,* to the district court's attention, and used it to support an entirely different proposition. *See supra* n. 3.

**6.** The Huntzingers' failure to inform the district court of their theory of imminent environmental harm is evidenced by a footnote in the trial court's opinion, which states that:

there may exist narrow exceptions to the general rule barring consideration of new arguments on appeal "where jurisdictional questions are presented or where, in exceptional cases, justice demands more flexibility," *Stern v. United States Gypsum, Inc.*, 547 F.2d 1329, 1333 (7th Cir.1977) (citation omitted), this case, in our view, neither implicates jurisdictional issues nor gives rise to exceptional circumstances.

### B. Policy Coverage and Owned Property Exclusion

■ Having concluded that the Huntzingers waived the above arguments on appeal, we turn to address the one issue they have preserved for our review; namely, whether the owned-property exclusion is inapplicable because the Huntzingers no longer "owned" the property at the time Crossman filed its complaint.[7] In considering this question, we, like the district court, apply Indiana law, for both parties are in agreement that that state's law governs this case. *See Wood v.*

> The court recognizes that owned property exclusions have been held not to apply to liability claims resulting from a government-mandated clean-up of the insured's property, and in some instances even to costs of cleaning up the insured's property to prevent imminent environmental harm to other property where the insurer would be liable to cover claims brought by neighboring property owners. *This case involves no such allegations.*

7. Although the Huntzingers do raise the owned-property exclusion issue on appeal, their brief merely sets forth a two-sentence summary as to what their position was before the district court (i.e., that *Hatco Corp. v. W.R. Grace & Co.— Conn.*, 801 F.Supp. 1334 (D.N.J.1992), renders the owned-property exclusion inapplicable), and why the trial judge rejected it on summary judgment. The Huntzingers go on to state that they "still maintain that Hatco can and should be applied here," without any further elaboration. In other words, the appellants are effectively asking us to refer back to their supporting brief on motion for summary judgment for the "unabridged" version of their owned-property exclusion argument. This Court has long recognized the doctrine, grounded in Rule 28(a)(4) of the Federal Rules of Appellate Procedure, that "we have no obligation to consider an issue that is merely raised, but not developed, in a party's brief." *Freeman United Coal Mining Co. v. Office of Workers' Compensation Programs*, 957 F.2d 302, 305 (7th Cir.1992) (emphasis added) (citing *Zelazny v. Lyng*, 853 F.2d 540, 542 n. 1 (7th Cir.1988)). There is, indeed, a fine line between a "developed" issue and an "undeveloped" one.

*Mid–Valley Inc.*, 942 F.2d 425, 427 (7th Cir. 1991) ("Courts do not worry about conflict of laws unless the parties disagree on which state's law applies."). Moreover, to the extent that the present issue is one which the Supreme Court of Indiana has heretofore not been called upon to resolve, "[o]ur duty is to determine, as best we can, how this dispute would be resolved by [that court]." *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir.1994) (citation omitted).

■ Under Indiana law, the Huntzingers, as the insureds, bear the initial burden of demonstrating that the nature of the Crossman complaint (i.e., the theory alleged therein) is one for which their policy of insurance provides coverage. *See Transamerica Ins. Servs. v. Kopko*, 570 N.E.2d 1283, 1285 (Ind.1991) (emphasis added) (explaining that the "duty to defend is determined solely by the nature of the complaint");[8] *see also*

> It is less than clear on which side of that line the Huntzingers' argument lies, but we shall give them the benefit of the doubt, along with an admonition that this Court may not be so forgiving the next time counsel flirts with failing to comply with Rule 28(a)(4).

8. In *Fidelity & Guar. Ins. Underwriters, Inc. v. Everett I. Brown Co.*, 25 F.3d 484, 489–90 (7th Cir.1994), we opined that the Indiana Supreme Court's holding in *Kopko* (i.e., that "[t]he duty to defend is determined solely by the nature of the complaint," as opposed to the facts of the underlying suit) "appears to be a dramatic departure from prior cases decided by the Indiana Court of Appeals," and went on to note that *Trisler v. Indiana Ins. Co.*, 575 N.E.2d 1021 (Ind.Ct.App. 1991), an Indiana Court of Appeals opinion issued after *Kopko*, was inconsistent with *Kopko*. Notwithstanding the inconsistency, we explained that this Court was "bound to rely on the [*Kopko*] decision of the Indiana Supreme Court." *Everett*, 25 F.3d at 490. While the Indiana Court of Appeals has not been as consistent in its adherence to *Kopko* since our decision in *Everett, see Indiana Farmers Mut. Ins. Co. v. Ellison*, 679 N.E.2d 1378, 1382 (Ind.Ct.App.1997) ("The duty to defend is determined from the allegations of the complaint and from the facts known or ascertainable by the insurer after an investigation has been made."); *Wayne Township Bd. of Sch. Comm'rs v. Indiana Ins. Co.*, 650 N.E.2d 1205, 1208 (Ind.Ct.App.1995) (citation omitted) ("The insurer may go beyond the face of the complaint and refuse to defend based upon the factual underpinnings of the claims against its in-

*Southbend Escan Corp. v. Federal Ins. Co.,* 647 F.Supp. 962, 966 (N.D.Ind.1986). If this burden is met, Hastings must then demonstrate that an exclusion applies. *See Flanders Elec. Motor Serv., Inc.,* 40 F.3d at 151. Several principles of contract construction are relevant. First, unambiguous language is accorded its plain and ordinary meaning. *See Eli Lilly & Co. v. Home Ins. Co.,* 482 N.E.2d 467, 470 (Ind.1985). And second, "where the language of an insurance policy is ambiguous, in that it is susceptible to more than one reasonable interpretation, the court must construe the language in favor of the insured." *Flanders Elec. Motor Serv.,* 40 F.3d at 151 (citing *Alexander v. Erie Ins. Exch.,* 982 F.2d 1153, 1157 (7th Cir.1993)). But this Court will not create an ambiguity where none exists; " 'if no ambiguity exists the policy will not be interpreted to provide greater coverage than the parties bargained for....' " *Id.* (citing *Alexander,* 982 F.2d at 1157).

### 1. Coverage Under the Huntzingers' Policy

As noted above, the Huntzingers carry the initial burden of demonstrating that the nature of the allegations set forth within the Crossman complaint is one for which their insurance contract with Hastings provides coverage. The trial court concluded that the complaint contained facts that fell within the parameters of the policy's "Farm and Personal Liability Provision," which bound Hastings to "pay, up to [its] limit of liability, all sums for which any insured is legally liable because of ... *property damage caused by an occurrence.*" Neither Hastings nor, of course, the Huntzingers challenge this conclusion on appeal, and we have always been

reluctant to consider issues upon which the litigants before us agree, save for perhaps those going to the subject-matter jurisdiction of the federal courts. *See Wood,* 942 F.2d at 427. We are nonetheless compelled to confront this question left unaddressed in the parties' briefs, for our resolution of the principal contested issue herein (i.e., *when* did the injury-causing "occurrence" trigger the owned-property exclusion under the Huntzingers' policy) is inextricably intertwined with the determination as to *whether* the Crossman complaint alleged "property damage caused by an occurrence." Allow us to digress for a moment to illuminate how and why this entanglement comes to bear in the first place.

The owned-property exclusion, which lies at the heart of the second issue in this appeal, states very simply that "[t]his policy does not cover liability ... [f]or damage to property owned by the insured." The Huntzingers would have us construe "damage to property" to mean that damage which existed at the time Crossman filed its complaint, that is, at a time when they no longer owned the property. Hastings, on the other hand, urges that the owned-property exclusion should not lose effect simply because the Huntzingers sold their land prior to the initiation of the Crossman suit. Instead, the insurer argues that the alleged "property damage" necessarily occurred when the Huntzingers buried solid waste on the site, before Crossman took ownership of the property. Without going too far into the merits of either party's position at this time, we need say only that the issue would best be resolved by determining when the "exclusion-triggering event" [9] occurred-before or after June 3, 1993, the date upon which the Hunt-

sured."); *see also Monroe Guar. Ins. Co. v. Monroe,* 677 N.E.2d 620, 624 (Ind.Ct.App.1997) (citations omitted) (noting "most recent cases ignore or do not discuss *Kopko*"), it is not within our province as a reviewing federal appellate court to make federal law, much less state law. We, therefore, continue to be bound by the doctrine set forth in *Kopko*.

9. The term " '[t]rigger of coverage' has been used by insured and insurer alike to denote the circumstances that activate the insurer's defense and indemnity obligations under the policy.... The issue is largely one of timing—what must

take place within the policy's effective dates for the potential of coverage to be 'triggered.' " *Indiana Gas Co. v. Aetna Cas. & Sur. Co.,* 951 F.Supp. 767, 770 (N.D.Ind.1996) (quoting *Montrose Chem. Corp. v. Admiral Ins. Co.,* 10 Cal.4th 645, 42 Cal.Rptr.2d 324, 327 n. 2, 913 P.2d 878, 881 n. 2 (1995)). Because the occurrence that "triggers" coverage under an insurance policy simultaneously "triggers" any exclusion that might be applicable, we shall refer to such event as "exclusion-triggering," rather than "coverage-triggering," for purposes of this opinion.

zingers formally transferred title in their property to Crossman. In short, if the injury-causing "occurrence" antedated the conveyance, then the owned-property exclusion would act to bar coverage. If not, the Huntzingers are arguably entitled to indemnification under the policy. But herein lies the rub—the two "trigger theories"(i.e., rules for determining when an occurrence policy provision is activated) that the courts of Indiana have heretofore adopted and applied, the "injury-in-fact" and "multiple-trigger," both require us to specifically identify the "occurrence" and "property damage" at issue. *See Eli Lilly & Co.*, 482 N.E.2d at 471 (applying a "multiple trigger interpretation of the 'injury'/'occurrence' language in [the insured's] policies"); *United States Fidelity & Guar. Co. v. American Ins. Co.*, 169 Ind.App. 1, 345 N.E.2d 267, 270 (1976) (employing doctrine consistent with "injury-in-fact" theory); *Indiana Gas Co.*, 951 F.Supp. at 771–72 (rejecting *Eli Lilly*'s "multiple-trigger" theory in concluding that "the damage occurred when the property was contaminated").[10] This brings us back to the initial question of whether the Crossman complaint alleged *"property damage* caused by an *occurrence."*

▇ To reiterate, the Huntzingers' policy triggers coverage for either "bodily injury" or "property damage" that results from an "occurrence." The parties agreed before the district court that the Crossman complaint did not allege "bodily injury" within the meaning the policy ascribed to that term. Thus, the Huntzingers argued that the complaint contained facts which satisfied the policy's definition of "property damage," that is, "injury to or destruction of tangible property, including the loss of its use." The trial judge

sided with the Huntzingers on this issue, opining that:

> [T]he Crossman complaint ... alleged that Warren Huntzinger "directed the burial of the solid waste" on the property and that the Huntzingers established and maintained a solid waste dump site on the property. The Crossman complaint also sought damages based on the costs of disposal and remediation. Thus, the Crossman complaint sought to establish liability, at least in part, for property damage within the meaning of the term in the Hastings policy.

(Mem. & Ord., at 13). While we can find some support in Indiana case law for this determination, there is likewise precedent in conflict with it. Only several months ago, in *R.N. Thompson & Assocs. v. Monroe Guar. Ins. Co.*, 686 N.E.2d 160 (Ind.Ct.App.1997), the Indiana Court of Appeals concluded that "economic losses" due to a building contractor's faulty workmanship did not constitute "property damage" within the meaning of a standard CGL insurance policy. The defendant-appellant therein, R.N. Thompson & Associates ("Thompson"), had built a housing development called Sandpiper Bay. When it was later discovered that roof decking on some of the buildings in Sandpiper Bay was damaged due to wood deterioration, that attics were poorly ventilated, and that excessive heat and moisture had built up in several of the units' attics, the Sandpiper Bay Homeowners Association sued Thompson for repair or replacement costs under a breach of implied warranty of habitability theory. Thompson demanded that its insurers, Monroe Guaranty Insurance Co. ("Monroe") and Commercial Union Insurance Co. ("Commer-

---

10. In *Indiana Gas Co.*, 951 F.Supp. at 772, the court relied in part on *Great Lakes Chem. Corp. v. International Surplus Lines Ins. Co.*, 638 N.E.2d 847 (Ind.Ct.App.1994), an environmental clean-up case wherein the Indiana Court of Appeals held that "the trigger for coverage is the time when the complaining party was damaged. Here, the City was damaged when the EDB pesticides were applied to the soil and contaminated the groundwater." *Id.* at 854. However, transfer was granted in *Great Lakes Chem. Corp.* on June 25, 1995, and the Supreme Court of Indiana has since that date not been called upon to adopt or incorporate by reference the reasoning set forth in that case. We are thus precluded

from relying upon *Great Lakes Chem Corp.* in our analysis today, just as the court in *Indiana Gas Co.* should have been in 1996. *See* IND. R.APP. P. 11(B)(3) ("If transfer be granted, the judgment and opinion or memorandum decision of the Court of Appeals shall thereupon be vacated and held for naught, except as to any portion thereof which is expressly adopted and incorporated by reference by the Supreme Court, and further, except where summarily affirmed by the Supreme Court."). We may nevertheless cite to *Indiana Gas Co.* to the extent that its outcome did not turn exclusively on *Great Lakes Chem. Corp.*

cial"), defend it in the Sandpiper suit and indemnify it for any adverse judgment entered in the action since its policies with those companies provided coverage for "property damage" caused by an "occurrence." On appeal from the trial court's entry of summary judgment in favor of Monroe and Commercial, the Indiana Court of Appeals affirmed. In so doing, it explained that CGL "coverage is for tort liability for physical damages to others, and not for contractual liability of the insured for economic loss suffered because the completed work is not what the damaged person bargained for." *Id.* at 162 (citations omitted). The court went on to distinguish between two types of risks—the risk that faulty workmanship will cause bodily injury and/or property damage to property other than the product or completed work itself and the risk that the insured's neglectful craftsmanship will result in a business expense of repair or replacement. The former is a risk that CGL insurance is meant to cover, whereas the latter is not:

> CGL coverage is premised on the idea that an insured contractor's work gives rise to two different types of risks.... When the contractor's work is faulty, either express or implied warranties are breached, and a dissatisfied customer may recover the cost of repair or replacement of the faulty work from the contractor as the standard measure of damages for breach of warranty. This consequence of not performing well is part of every business venture, and the repair or replacement of faulty goods and work is a business expense, to be borne by the contractor in order to satisfy customers.

But there is also a second kind of risk inherent in a contractor's line of work; that is, injury to people and damage to property caused by faulty workmanship. This type of accidental injury to persons or property can expose the contractor to almost limitless liability. And while the same neglectful craftsmanship can result in both a business expense of repair or replacement and a loss represented by damage to persons or property, the two results are vastly different in relation to sharing the costs of such risks as a matter of insurance underwriting.

*Id.* (citations omitted). The court concluded that since Thompson's claim against Monroe and Commercial arose from "economic loss" suffered by the Association, and not from damage to property other than the contractor's completed work itself, there was no evidence of "property damage" for which Thompson could recover under its CGL policies. *See id.* at 164.

To our way of thinking, the case *sub judice* is no different than *R.N. Thompson & Associates* in that it does not involve a situation wherein Crossman alleged "property damage" as that term is understood in the context of a CGL policy like the Huntzingers'. No one suffered bodily injury by reason of the solid waste dump, nor was property other than the parcel that the Huntzingers sold to Crossman injured as a result of the buried, nonhazardous, non-migratory materials.[11] This is a case in which the Huntzingers warranted and represented to an innocent purchaser that the land they sold complied with all applicable environmental laws. Crossman unearthed an alleged environmen-

---

11. There is ample support in the record for our observation that the buried materials were neither hazardous nor migratory. The site assessment report prepared by ATEC related that the buried solid waste posed no cause for environmental concern:

> Debris including red brick, fire bricks and glass shards was found at the northeast corner of Parcel B.... It appears that topsoil was removed for use off site and no concerns are present based on this finding. No evidence of staining or vegetative stress was noted at the parcel.

Other courts have likewise made the legal determination that bricks and glass are nonmigratory and pose no threat to the environment. *See Hub*

*Recycling, Inc. v. Louis Usdin Co.*, 106 B.R. 372, 376 (D.N.J.1989) (construction debris, rocks, brick, wood, glass and aluminum are "not inherently dangerous in the sense of an irritant or contaminant and thus not subject to the policy's [pollution] exclusion"); *Titan Corp. v. Aetna Cas. & Sur. Co.*, 22 Cal.App.4th 457, 468, 27 Cal. Rptr.2d 476 (1994) (holding that dumped brick, wood and rubbish are "not contaminants" and "not injuries to third party property. Instead, these wastes represented problems limited to the site...."). The Huntzingers' motion for summary judgment even cited these authorities, among others, to advance the argument that "ordinary bricks and glass ... [are] of no environmental concern."

tal violation, and brought suit under a "breach of representations and warranties" theory for the cost associated with remediating (i.e., repairing) the property.

On the other hand, the Indiana Court of Appeals has also held "that the 'ordinary meaning of [property] damages is so broad that it encompasses ... environmental response costs.'" *Hartford v. Dana Corp.*, 690 N.E.2d 285, 298 (Ind.Ct.App.1997) (quoting *Farmland Indus. v. Republic Ins. Co.*, 941 S.W.2d 505, 511 (Mo.1997) (en banc)). Although it would perhaps be disingenuous to characterize the Huntzingers' expense in cleaning up non-hazardous solid waste on Crossman's demand as an "environmental response cost," one might very well be led to conclude that the Huntzingers directly "injured" the parcel of land (i.e., tangible property) it sold to Crossman in that, as the complaint alleged, "Plaintiff has been damaged to the extent of the costs of disposal of the solid waste." It is likewise probable that Crossman suffered indirect losses (i.e., the loss of the land's use) as a result of the "contamination," for "the Plaintiff intended to construct single family detached homes upon the Real Estate," and its efforts were presumably delayed due to the remediation process. *While we do not attempt to resolve the foregoing conflict in authority, of utmost importance for purposes of our discussion is to recognize that any and all "property damage," if in fact there is any in the first place, was caused by the Huntzingers' establishment and maintenance of the solid waste dump.*

Of course, "property damage," by itself, is insufficient to trigger Hastings' duty to defend and/or indemnify—such damage must have been "*caused by* an occurrence." The Huntzingers' policy defines the term occurrence as "an *accident,* including continuous or repeated exposure to substantially similar conditions, originating during the policy period." While the policy leaves the key word therein, "accident," undefined, the trial court pointed out that the Huntzingers, Hastings, as well as the Indiana courts, all agree that "'accident' means unexpected or unintended—a happening without intention or design." (Mem. & Ord., at 9); *see also Nation-*

*al Mut. Ins. Co. v. Eward,* 517 N.E.2d 95, 100 (Ind.Ct.App.1987) (citation omitted) ("The word 'accident,' as it is ordinarily used means an unexpected happening without an intention or design."). It logically follows then that, for coverage to lie, the "property damage" had to have been *caused by* an "unexpected or unintended" act or event. It is at this point that our reasoning diverges from that of the district court.

The trial judge commenced his "occurrence" analysis, observing that "[t]he allegations related to the Huntzingers' intentions and their knowledge of the dump site on their property are critical here." (Mem. & Ord., at 9). In other words, he seemed to believe that those averments relating to the Huntzingers' intentions with respect to, and knowledge of, the dump site on their property at the time they conveyed it to Crossman were pivotal. If it was alleged that the Huntzingers intended to defraud Crossman, one could hardly suggest that any damage resulting from the transaction arose out of an "accident." The judge then proceeded to examine the Crossman complaint, paragraphs 13 and 15 of which read as follows:

13. Defendant Warren K. Huntzinger directed the burial of the solid waste on the Real Estate. Defendant Nancy J. Huntzinger *knew, or should have known*, that solid waste was buried on the site at the time of the execution of the Purchase Agreement.

\* \* \* \* \* \*

15. The Defendants *knew, or should have known*, that the establishment and maintenance of such solid waste dump on the Real Estate constituted a violation of the law and a breach of the representations and warranties of the Purchase Agreement.

It is clear that the "knew or should have known" components of these allegations sound in negligence, *see, e.g., Smith v. Metropolitan Sch. Dist.*, 128 F.3d 1014, 1028–29 (7th Cir.1997) ("[T]he 'should have known' prong ... is a standard based on negligence, not intent.") (citing *Guess v. Bethlehem Steel Corp.*, 913 F.2d 463, 465 (7th Cir.1990)); *Dausch v. Rykse*, No. 93–1459, 1994 WL 596558, \*10 (7th Cir., Nov. 2, 1994) (explain-

ing that "allegations that the defendant churches knew or should have known ... are sufficient to state that ... the church defendants were negligent"), and that all parties hereto agree that an accident is "a happening without intention or design" (i.e., an event predicated on more than merely negligent conduct). It was on this basis that the district judge concluded that "[t]he alleged facts supporting a negligence claim alleged an 'occurrence.'" (Mem. & Ord., at 11). While we concur in the trial court's conclusion that the Crossman complaint alleged an "occurrence," we do not believe that such "occurrence" *caused* "property damage," as the Huntzingers' policy requires.

No ambiguity inheres the word "cause"— it is a common term used throughout many areas of the law, including insurance law. "Causation ... [is] the requirement of a reasonable connection between a defendant's conduct and the damages which a plaintiff has suffered...." *Smith v. Beaty*, 639 N.E.2d 1029, 1033 (Ind.Ct.App.1994) (citing *Daub v. Daub*, 629 N.E.2d 873, 877 (Ind.Ct. App.1994)). The "property damage" in this case certainly was not caused by the Huntzingers' alleged fraudulent misrepresentation with respect to the condition of the land they sold to Crossman—the Huntzingers even argued in their supporting summary judgment brief to the trial court that "this is not a case where the underlying complaint seeks damages for loss in value to the property *because of* misrepresentation." Rather, being that the nonhazardous, non-migratory glass and brick posed no threat to the environment, *see supra* p. 311 n. 11, the cause of the resulting economic loss was the Huntzingers' *intentional* conduct in establishing and maintaining the solid waste dump. *Cf. R.N. Thompson & Assocs.*, 686 N.E.2d at 162 (explaining that poor craftsmanship in building structure "results in," i.e., causes, economic loss). Even if we assumed, however, that the buried materials were somehow hazardous pollutants (i.e., if they were cov-

ered with a toxic chemical) that contaminated the soil surrounding the dump site, the cause of that damage—the leeching of the waste into the environment—still would not be an occurrence. *Patz v. St. Paul Fire & Marine Insurance Co.*, 15 F.3d 699 (7th Cir. 1994), nicely illustrates this distinction. In that case, we reasoned that where one deliberately buries contaminants in a barrel that "suddenly and accidentally" leaks or breaks, allowing the discharge of waste into the surrounding land or water, the consequent pollution is unintentional. *Id.* at 703. "As the barrels themselves ... [are] not contaminants, no discharge of contaminants into the soil occurred until the barrels leaked or broke. The discharge that occurred then— the discharge from the barrels-was 'sudden or accidental' in the sense of unintended and unexpected...." *Id.* Thus, so long as the polluter evidences an intent to prevent the contaminants from leeching into the environment after burying them, any resulting seepage and, in turn, damage to land, water or air is accidental. Most often, this intent will be manifested by the polluter's objectively reasonable belief that the artificial, non-hazardous container (i.e., barrel) in which he buries waste is sufficiently secure to safely hold in its contents. As the *Patz* panel explained, however, discharging waste directly into an earthen pit may demonstrate a similar intent if the polluter possesses an objectively reasonable belief that the special characteristics of the soil obviates the need for an artificial bottom or lining. "[D]espite its lack of artificial materials," we stated, the hole into which the Patzes poured contaminants was an adequate containing structure, and did not evidence an intent to discharge pollutants, since "[t]he Patzes believed (a belief induced by their [environmental] consultants) that they were taking advantage of the clay composition of the soil to avoid the expense of an artificial bottom for the pit."[12] *Id.* "The introduction of the ... [contaminants] into such a structure is different

---

12. The Patzes' environmental consultant suggested that an open pit be dug into which phosphatic water would be discharged. *See id.* at 701. At the time, it was well-accepted in the waste disposal industry that the water would evaporate, leaving behind deposits of phosphate solids that

could be removed and used for fertilizer. *See id.* "Because the soil where the pit was to be dug was highly compacted clay soil, the water was expected to evaporate before it could permeate the soil, and so the soil beneath the pit would not be contaminated." *Id.* at 702.

*from just dumping wastes onto land" whose soil is permeable to contaminants. Id.* (emphasis added). It follows, then, that if one buries waste in a container (i.e., barrel or soil pit) that an objectively reasonable person would not believe is adequate to prevent the escape of pollutants, the subsequent leeching of contaminants into the environment is neither unexpected nor accidental. The record in this case makes crystal clear that the Huntzingers failed to secure the glass shards, fire bricks and red bricks in either an "artificial" container or an earthen pit which an objectively reasonable person would have believed was insusceptible to rupturing or leaking. Accordingly, even if those materials were covered with a toxic chemical or otherwise hazardous, which we are certain they were not, the Huntzingers were, to borrow from *Patz*, "just dumping wastes onto land," *id.*, thereby rendering as intentional whatever leeching and environmental damage that would have followed. And " '[t]he principle that insurance should only be employed to transfer risks associated with fortuitous occurrences means that generally no coverage will exist for a loss that is caused intentionally.' " *Stevenson v. Hamilton Mut. Ins. Co.*, 672 N.E.2d 467, 471 (Ind.Ct.App.1996) (quoting R.E. Keeton & A.I. Widiss, *Insurance Law* § 5.4(d)(1) (1988)). In sum, it cannot reasonably be said that the Crossman complaint alleged property damage caused by an accidental occurrence.

We hold that the Crossman complaint failed to allege an "occurrence" that caused

property damage, and therefore, the Huntzingers are not entitled to coverage pursuant to the parties' contract of insurance. The rest is academic—because there is no coverage, there is nothing for the owned-property exclusion to bar. However, even if we assumed, *solely for purposes of discussion*, that the Crossman complaint did allege "property damage caused by an occurrence," and that we were thus compelled to entertain the Huntzingers' owned-property argument, our ultimate disposition of this appeal would remain unchanged, albeit for reasons which neither of the parties seem to have countenanced in their briefs.

### 2. *Owned–Property Exclusion*

 As explained above, our inquiry, on the most general level, is whether the "exclusion-triggering event" antedated or postdated the Huntzingers' July 3, 1993, conveyance of their property to Crossman.[13] Simply put, if the injury-causing "occurrence" preceded July 3, then the owned-property exclusion is applicable and there is no coverage. If not, Hastings is obligated to indemnify the Huntzingers. Unfortunately, "trigger theories" are not uniform across jurisdictional lines. In fact, as many as seven markedly different theories have emerged among the courts, none of which, contrary to the Huntzingers' argument, purport to activate coverage when a third-party files his or her complaint against the insured:

> groundwater beneath neighbors' property if the clean-up had not been ordered, whether but for the clean up the contamination from the barrels ... would have leached to soil beneath the neighbors' property, or in short how much of a risk to other people's property the contamination created.
>
> *Id.* (citations omitted). *Patz* should not be interpreted to mean that it is irrelevant whether or not there is any risk at all to third-party property when considering the applicability of an owned-property exclusion. Rather, it is the magnitude of that risk which is of little import. *In short, there must be some threat of harm to the environment or to another's property for Patz to apply.* Here, the Huntzingers buried non-hazardous, non-migratory solid waste on their own property, and we have no reason to believe that these materials posed any threat to the environment or third-party land.

---

**13.** It should be mentioned that *Patz*, 15 F.3d 699, is of little or no consequence on this issue and not simply because the Huntzingers have waived arguing in favor of its applicability. That case involved environmental contamination on land owned by the insured, the Patzes, but which had *not yet* seeped onto neighboring property. This Court concluded that the owned-property exclusion set forth in the Patzes' insurance policy with St. Paul Fire and Marine Insurance Co. did not bar coverage even though "to date the only contamination from the waste materials generated by the [Patzes'] painting operation is to soil and groundwater within the boundaries of the Patzes' own land." *Id.* at 705. Chief Judge Posner, writing for the panel, explained:

> On the view we take of the owner-exclusion clause, it is irrelevant whether the groundwater beneath the Patzes' property is owned by them or ... by the state, how soon the groundwater contamination would have spread to

First, the wrongful act theory would hold that the occurrence causing property damage took place when the [environmentally-damaging] spill occurred. Second, the exposure theory would hold that the occurrence causing property damage took place when the [contaminants] leeched into the environment. Third, the injury-in-fact theory would hold that the occurrence causing damage to property took place when the level of [contaminants] was such that the [property] was actually injured or contaminated. Fourth, the manifestation theory would hold that the occurrence causing property damage took place when the damage became "reasonably capable of ... diagnosis." Fifth, the first discovery theory would hold that the occurrence causing damage to property took place when the property owner actually discovered the pollution. The sixth theory is a combination of the fourth and fifth. Under this theory, the occurrence causing damage to property took place when the insured "knew or should have known" of the property damage. Finally, the continuous trigger theory would hold that the occurrence causing property damage took place both at the time of exposure and at the time of manifestation.

*CPC Intern. v. Northbrook Excess & Surplus Ins.*, 46 F.3d 1211, 1219–20 (1st Cir.1995) (citations omitted). To further confuse matters, a given jurisdiction oftentimes will not apply the same theory across all causes of action. This seems to hold true in Indiana as well, but the courts of that State have at least seen fit to whittle the list of seven down to two. The general rule under Indiana law is consistent with the "injury-in-fact" theory in that "[t]he time of the occurrence of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed but the time when the complaining party was actually damaged." *United States Fidelity & Guar. Co.*, 345 N.E.2d at 270 (citation omitted); *see also Baylor Heating & Air Conditioning, Inc. v. Federated Mut. Ins. Co.*, 987 F.2d 415, 418 (7th Cir. 1993); *Indiana Gas Co.*, 951 F.Supp. at 772 (applying Indiana law in environmental clean-up case). Yet, in *Eli Lilly & Co.*, 482 N.E.2d 467, a diethylstilbestrol ("DES") case,

the Supreme Court of Indiana departed from the "injury-in-fact" approach in favor of a "multiple trigger interpretation of the 'injury'/'occurrence' language in [the insured's] policies." *Id.* at 471. That having been said, we need not attempt to bring order to this confusion and concern ourselves with determining whether the Supreme Court of Indiana would have us apply the "injury-in-fact" or "multiple trigger" theory in the context of this dispute. The fact of the matter is that both theories bring about the same result—the Huntzingers lose.

■■■ Under the "multiple trigger" theory, each insurer on a given risk between the date of exposure to an injury-causing agent and the manifestation of injury as a result of such exposure is liable to the insured for indemnification. *See id.* Thus, "at least two possible time considerations, exposure and manifestation, are relevant." *Id.* at 470. These two points in time are relatively easy to determine in a case like *Eli Lilly* where women ingested DES during pregnancy, and their female offspring later developed vaginal clear-cell adenocarcinoma, vaginal adenosis and other DES-related disorders. Nor are these dates terribly difficult to ascertain when a dispute arises over the migration of buried hazardous waste from one individual's property onto another's. In such an instance, exposure "occurs at the moment that hazardous wastes are improperly released into the environment," *Continental Ins. v. N.E. Pharm. & Chem. Co.*, 811 F.2d 1180, 1189 (8th Cir.1987), and manifestation "is judged by the time at which the leakage and damage are first discovered." *Mraz v. Canadian Universal Ins. Co.*, 804 F.2d 1325, 1328 (4th Cir.1986); *see also Eagle–Picher Indus. v. Liberty Mut. Ins. Co.*, 682 F.2d 12, 24 (1st Cir.1982) (applying Indiana and Ohio law). Although the exposure date cannot be pinpointed in this case, we most certainly know it was before the Huntzingers sold their property to Crossman. And as for the date of injury manifestation, it is uncontroverted that the Huntzingers knew about the solid waste dump site, and therefore had "discovered" it at the very latest when they received ATEC's environmental site assessment report on April 15, 1993, almost two

months in advance of closing. Of course, this "discovery" means little unless the non-hazardous, non-migratory waste had "damaged" the property while the Huntzingers still owned it. In this regard we recognize that the red bricks, fire bricks and glass shards posed no threat to the environment or third-party property, nor did these buried materials interfere with the Huntzingers' enjoyment of their land. However, "damage" is present to the extent that the dump decreased the value of the property in, among other things, making it unsuitable for residential development, as well as opening the Huntzingers up to potential enforcement actions by state regulatory agencies. *See, e.g.*, IND. STAT. ANN. 13–30–2–1 (1997) ("A person may not ... [d]eposit or cause or allow the deposit of ... solid waste upon the land, except through the use of sanitary landfills, incineration, composting, garbage grinding, or another method acceptable to the solid waste management board."). It would be no different than if the Huntzingers tore the inflatable bladder of the supplemental restraints (i.e., airbags) in their automobile and later sold the car to Crossman without disclosing the presence of the defect, knowing full well that Crossman would only purchase the vehicle if it had functioning airbags. The vehicle could still operate properly in the absence of working airbags, but would nevertheless have been "damaged" before the Huntzingers relinquished ownership of it. In a somewhat analogous case to this one, *Titan Corp. v. Aetna Casualty & Surety Co.*, 22 Cal.App.4th 457, 27 Cal.Rptr.2d 476 (1994), the California Court of Appeals considered whether dumped brick, concrete, wood and other nonhazardous rubbish "damaged" property while the insured still owned it. It concluded:

> The solid wastes were situated solely on the Keasby site. While *the presence of solid wastes on the site may have damaged the insured's property*, it appears to have caused no actual injury to third party property. The Aetna policy provided: "This insurance does not apply: ... (k) to property damage to (1) property owned or occupied or rented to the insured; (2) property used by the insured." The solid waste removal falls within this exclusion.

*Id.*, 27 Cal.Rptr.2d at 484 (emphasis added). That is, "damage" was manifest even though the buried material did not harm the environment.

The injury-in-fact type of trigger theory would have us reach the same result. Under that theory, "the time of the occurrence of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed but the time when the complaining party was actually damaged." *United States Fidelity & Guar Co.*, 345 N.E.2d at 270 (citation omitted). As just explained, the complaining party, the Huntzingers, were damaged at the time they buried solid waste on their property. And this was well before the date they transferred title in the land to Crossman.

The lone authority to which the Huntzingers cite in support of their position that the owned-property exclusion is inapplicable, *Hatco Corp.*, 801 F.Supp. 1334, a New Jersey district court case, is in our view unavailing. In *Hatco*, W.R. Grace & Co. ("Grace") operated a chemical manufacturing facility in Fords, New Jersey, known as the Hatco Chemical Division, and routinely pumped chemical effluent into lagoons located on its property. *See id.* at 1343. Grace subsequently sold the Fords site to the Hatco Corporation ("Hatco") in 1978. *See id.* at 1359. Then, in 1989, Hatco sued Grace seeking indemnification and contribution pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601 *et seq.*, for the costs associated with remediating the Fords site. *See id.* at 1343. Grace, in turn, sued its insurers for indemnification, asserting that all of the damages for which it may have been liable were covered "occurrences" under its CGL policies, and sought a summary judgment holding that the "owned-property" exclusions set forth within those policies did not bar coverage to damage which occurred to the Hatco site after it had sold, and thus no longer owned, the property. *See id.* at 1359. More specifically, "Grace contend[ed] that the unambiguous language of the owned-property exclusion does not preclude damage for property formerly owned [by] Grace, and that if the insurers

intended to exclude such property from coverage they could easily have done so with an 'alienated premises' exclusion."[14] *Id.* The court bought Grace's "alienated premises" exclusion argument, concluding "that the reasonable expectations of the parties to a contract that does not contain such a provision is that the owned-property exclusions do not bar coverage for damage that occurs on alienated property." *Id.* Even if we were to ignore the fact that, unlike in *Hatco*, all damage to the Huntzingers' property occurred while they still owned it, our general reservations about the persuasiveness of the New Jersey federal district court's holding on Indiana courts are only reinforced by the Supreme Court of New Jersey's decision in *Wickner v. American Reliance Ins. Co.*, 141 N.J. 392, 661 A.2d 1256 (1995), a case in which *Hatco* was rejected outright:

> We note further that plaintiffs rely on *Hatco Corp. v. W.R. Grace & Co.*, 801 F.Supp. 1334 (D.N.J.1992), for the proposition that the unlisted premises exclusion does not apply to property no longer owned by the insured in the absence of an express alienation clause.... The record simply does not support the conclusion that the reasonable expectations of parties to an insurance contract will have been in any way influenced by the omission of an alienated property clause from the insurance policy.
>
> If the policy exclusions were found not to apply in this context, then we would be providing insureds for having sold their property than would be attributable to them during the time they owned that property. That interpretation can be neither derived from the language of the policy, reasonably inferred from the intentions of the parties, nor imputed as their reasonable expectations.

*Id.* at 1259. We are of the belief that *Wickner* more accurately reflects the reasonable expectations of the parties to an insurance contract. The Huntzingers do not, and by our review cannot, direct us to a point in the record suggesting that the absence of an

alienated property provision might have led them to believe that the sale of their property would result in broader insurance coverage than their retention of it. In short, the owned-property exclusion would bar any and all coverage available to the Huntzingers had the Crossman complaint alleged property damage caused by an occurrence.

## IV. CONCLUSION

We conclude that the trial court did not err by granting summary judgment in Hastings' favor. The Crossman complaint did not allege "property damage caused by an occurrence," thereby entitling the Huntzingers to coverage in the first place. And furthermore, even if we assumed, *arguendo*, that such was not the case, coverage would be barred under the owned-property exclusion. The judgment of the district court is

AFFIRMED.

---

14. The *Hatco* court noted that a typical "alienated premises" exclusion provides something to the effect of, "This Insurance policy does not apply ... to injury to or destruction of ... premises alienated by the named Insured." *Id.* at 1359 n. 11.