**R.N. THOMPSON & ASSOCIATES, INC., Appellant–Defendant,**

v.

**MONROE GUARANTY INSURANCE COMPANY and Commercial Union Insurance Company, Appellees–Plaintiffs.**

No. 49A05–9609–CV–362.

Court of Appeals of Indiana.

Oct. 14, 1997.

James N. Scahill, Schnorr, Good, Scahill & Maier, Indianapolis, for Appellant–Defendant.

Julie L. Michaelis, Wooden & McLaughlin, Indianapolis, Lawrence W. Gaston, Jr., James P. Cavanaugh, III, Moore & Gaston, Indianapolis, for Appellees–Plaintiffs.

## OPINION

BARTEAU, Judge.

R.N. Thompson & Associates (Thompson) appeals a grant of summary judgment in favor of Monroe Guaranty Insurance Co. (Monroe) and Commercial Union Insurance

Co. (CU). Thompson raises one issue, which we restate as:

> Whether damage arising from inadequate materials and substandard construction work is covered by a commercial general liability (CGL) insurance policy which obliges the insurer to defend the insured contractor in suits involving "property damage" caused by an "occurrence."[1]

We affirm.

### FACTS

Thompson was the builder and developer for 45 units which make up a portion of a planned development called Sandpiper Bay, located in Indianapolis. In 1993, the Sandpiper Bay Homeowners Association sued Thompson for breach of implied warranty of habitability. The Association alleged that the roof decking on some of its buildings was damaged due to degradation of the plywood used for a portion of the roof; that the attics were improperly vented; that clothes dryers were improperly vented directly into the attics; that the roof system was built in a substandard manner; and that failure to inspect and reject substandard work allowed excessive heat and moisture to build in the attic areas. It sought damages consisting of the expense it would incur to repair or replace the defectively designed, constructed, inspected, or maintained units.

Monroe and CU both issued CGL policies to Thompson. Both insurers' policies agree to pay sums that Thompson becomes legally obligated to pay as damages because of "property damage" to which the insurance applies, and both impose a duty on the insurer to defend Thompson in suits seeking those damages. The insurance applies to "property damage" only if the property damage is caused by an "occurrence," and it defines "occurrence" as an "accident, including continuous exposure to substantially the same general harmful conditions." *E.g.,* R. at 1163.

Thompson demanded that Monroe and CU defend it in the action by Sandpiper Bay, and that they indemnify Thompson for any judgment entered in the action. Monroe and CU then moved for summary judgment. Both motions asserted that the only damages claimed by Sandpiper Bay were for economic loss, and not "property damage" caused by an "occurrence." The trial court granted summary judgment in favor of Monroe and CU, concluding that Sandpiper was claiming only "economic loss," which cannot be considered property damage,[2] and that the damages were not covered because they did not arise from an "accident."

### STANDARD OF REVIEW

In reviewing the grant of a summary judgment motion, we apply the same standard applicable in the trial court. Summary judgment is proper only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Ind.Trial Rule 56(C). We do not weigh the evidence, but will consider the facts in the light most favorable to the non-moving party. *Grose v. Bow Lanes, Inc.,* 661 N.E.2d 1220, 1224 (Ind.Ct.App.1996). We must reverse the grant of a summary judgment motion if the record discloses an incorrect application of the law to those facts. *Ayres v. Indian Heights Volunteer Fire Dept., Inc.,* 493 N.E.2d 1229, 1234 (Ind.1986). However, if there is no genuine issue of material fact,

---

1. Both appellees argue, in the alternative, that even if the Association's claims do involve "property damage" caused by an "occurrence," the damage took place at a time when the policies were not in effect. Because we find the policies do not cover the losses claimed by the Association, we need not address the time of the damage nor the policy periods.

2. The trial court also determined that Thompson was estopped from asserting that the Association's claim involved "property damage." Thompson had previously filed a Motion to Dismiss the Association's negligence claim on grounds that the Association had alleged only "economic loss," and economic loss could not be recovered under a negligence theory. Thompson's motion was granted. Because Thompson was granted affirmative relief in the underlying action based on its assertion that the Association had suffered only economic damage, the trial court concluded Thompson could not now take the contrary position that the Association is seeking damages other than economic loss. Thompson does not challenge the trial court's estoppel conclusion on appeal. Notwithstanding the estoppel, we choose to address the merits of Thompson's appeal.

we will affirm a summary judgment based on any theory supported by the record. *Anderson v. Horizon Homes, Inc.,* 644 N.E.2d 1281, 1289 (Ind.Ct.App.1995), *trans. denied.* On appeal from a grant of summary judgment, the burden is on the appellant to prove the trial court erred in determining there were no genuine issues of material fact and that the moving party was entitled to judgment as a matter of law. *Welch v. Scripto–Tokai Corp.,* 651 N.E.2d 810, 813 (Ind.Ct.App.1995).

### PROPERTY DAMAGE

■ Both insurers' policies define "property damage" as "physical injury to tangible property, including all resulting loss of use of that property." [3] *E.g.,* R. at 1164. While the Association's loss in the underlying claim resulted, at least in part, from deterioration of the plywood roofing material Thompson installed, such loss is not "property damage" as contemplated by the provisions of a CGL policy.

■ We note at the outset that the language in the Monroe and CU policies is standard language found in the great majority of CGL policies written in this country. These provisions were developed in 1940 and have been periodically revised since, and they have become an established norm of underwriting policy. *Weedo v. Stone–E–Brick, Inc.,* 81 N.J. 233, 405 A.2d 788, 790 (1979). Because of the uniformity of language in CGL policies, we find factually similar decisions from courts elsewhere to be particularly persuasive.

■ The great weight of that authority is to the effect that CGL policies cover the possibility that the goods, products, or work of the insured, once relinquished or completed, will cause bodily injury or damage to property *other than* to the product or completed work itself, and for which injury or damage the insured might be exposed to liability. The coverage is for tort liability for physical damages to others, and not for contractual liability of the insured for economic loss suffered because the completed work is

not what the damaged person bargained for. *See, e.g., Weedo,* 405 A.2d at 791; *Bor–Son Bldg. Corp. v. Employers Commercial Union Ins. Co.,* 323 N.W.2d 58, 63 (Minn.1982); *Vernon Williams and Son Constr., Inc., v. Continental Ins. Co.,* 591 S.W.2d 760, 763 (Tenn.1979).

This interpretation of the extent of CGL coverage is premised on the idea that an insured contractor's work gives rise to two different types of risk. Typically, a contractor holds himself out as being capable of completing the bargained-for construction in a workmanlike manner. At the same time, the property owner relies upon that representation and anticipates suitable goods and services. When the contractor's work is faulty, either express or implied warranties are breached, and a dissatisfied customer may recover the cost of repair or replacement of the faulty work from the contractor as the standard measure of damages for breach of warranty. *Weedo,* 405 A.2d at 791. This consequence of not performing well is part of every business venture, and the repair or replacement of faulty goods and work is a business expense, to be borne by the contractor in order to satisfy customers. *Id.*

But there is also a second kind of risk inherent in a contractor's line of work; that is, injury to people and damage to property caused by faulty workmanship. This type of accidental injury to persons or property can expose the contractor to almost limitless liability. *Id.* And while the same neglectful craftsmanship can result in both a business expense of repair or replacement and a loss represented by damage to persons or property, *id.; Indiana Ins. Co. v. DeZutti,* 408 N.E.2d 1275, 1279 (Ind.1980), the two results are vastly different in relation to sharing the costs of such risks as a matter of insurance underwriting.

The *Weedo* court explained the distinction between "business risks" and occurrences which give rise to insurable liability:

When a craftsman applies stucco to an exterior wall of a home in a faulty manner

---

**3.** One of the Monroe policies defines property damage as *"physical injury to or destruction of* tangible property." R. at 33. The additional

phrase in that definition does not affect our analysis of the question whether the Association's losses are "property damage."

and discoloration, peeling and chipping result, the poorly-performed work will perforce have to be replaced or repaired by the tradesman or by a surety. On the other hand, should the stucco peel and fall from the wall, and thereby cause injury to the homeowner or his neighbor standing below or to a passing automobile, an occurrence of harm arises which is the proper subject of risk-sharing as provided by the type of policy before us in this case. The happenstance and extent of the latter liability is entirely unpredictable[;] the neighbor could suffer a scratched arm or a fatal blow to the skull from the peeling stonework. Whether the liability of the businessman is predicated upon warranty theory or, preferably and more accurately, upon tort concepts, injury to persons and damage to other property constitute the risks intended to be covered under the CGL.

*Id.* So, a claim limited to remedying faulty workmanship or materials, like the Association's claim against Thompson, does not involve "physical injury to tangible property," or "property damage." *See Vernon Williams & Son,* 591 S.W.2d at 763 (holding that such a claim does not involve property damage defined as "injury to or destruction of tangible property").

4. We recognize that both *Weedo* and *DeZutti* defined the scope of the CGL coverage in part by addressing exclusions to the policies, specifically an exclusion of coverage for "property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of the materials, parts, or equipment furnished in connection therewith...." However, the *Weedo* reasoning has led courts to the same result without reliance on the policy exclusions, e.g., *Bor–Son*. Furthermore, we note that Thompson's policies contain exclusions similar to those in *Weedo* and *DeZutti* which exclude from coverage property damage to "that particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or ... [t]hat particular part of any property that must be restored, repaired, or replaced because "your work" was incorrectly performed on it." *E.g.*, R. at 1157–1158.

The latter exclusion does not apply to "products completed operations hazard insurance," and none of the policies provide a separate sec-

Our supreme court followed *Weedo* in *De-Zutti*, where the court determined that the CGL policy at issue did not provide coverage to include reimbursement to a builder for expenditures required to correct, repair, or replace his own poor workmanship.[4] 408 N.E.2d at 1279. There, a general contractor and his subcontractors[5] built a home in 1967 and sold it to the DeZuttis. The DeZuttis sued the contractor several years later, alleging that cracking in the bricks and mortar resulted from improper construction of the building's footings. The supreme court found the damage was not covered by the contractor's CGL policy:

> [T]he costs attendant upon the repair or replacement of the insured's own faulty work is part of every business venture and is a business expense to be borne by the insured-contractor in order to satisfy customers. It is a business risk long excluded by comprehensive liability policies. Another form of risk in the insured-contractor's line of work is injury to people and damage to other property caused by the contractor's negligence or defective product. It is this risk which the policy in question covers.

*Id.* at 1279.

We reached the same result in *Aetna Life & Cas. v. Patrick Indus.,* 645 N.E.2d 656 (Ind.Ct.App.1995), *trans. denied.* Patrick,

tion setting out the coverage for that type of insurance. But because the coverage, by definition, is limited to "bodily injury" and "property damage," and because we find that economic losses arising out of the insured's defective materials or workmanship are not within the definition of "property damage," we do not address the "products completed operation hazard" coverage separately.

5. We note Thompson's argument, based on *O'Shaughnessy v. Smuckler Corp.,* 543 N.W.2d 99 (Minn.Ct.App.1996) that a 1986 revision to the standard CGL policy exclusions provides coverage for certain property damage resulting from work performed for the insured by a subcontractor. That revised language is included in the Thompson policies. However, as discussed above, the Association's claim is not one for "property damage," because there was no physical injury to any property apart from the deterioration of the roof decking itself. So, we need not address the potential effect of whether the Association's losses resulted from Thompson's own work or that of a subcontractor.

the insured, bought particle board from a supplier and glued a vinyl covering onto it. Patrick then sold the particle board to Fleetwood, a manufacturer who installed the particle board in camper trailers. The vinyl began peeling off the installed particle board, apparently because of defects in the particle board itself. Fleetwood manufactured nondefective replacements and replaced the defective products at a cost of about $200,000. Patrick settled with Fleetwood and sought coverage from Aetna under a standard CGL policy which defines "property damage" in the same words as does the Thompson policy at issue here.

We decided that summary judgment in favor of the insurer was appropriate because the diminution in value to Fleetwood's campers resulting from the insured's defective products was not "property damage" as defined in the CGL policy.[6] *Id.* at 660. Because "the commercial parties bargain for limited coverage in exchange for modest premiums," *id.* at 662, we declined to hold that "physical injury will be deemed to occur every time a defective component is integrated into another's tangible property." *Id.*

Because Thompson's claim arises from economic loss suffered by the Association, and not from damage to property other than the contractor's completed work itself, there was no "property damage" covered by Thompson's CGL policies.

### OCCURRENCE

■ Thompson's CGL coverage only applies to property damage which is caused by an "occurrence."[7] An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *E.g.*, R. at 1163.

■ An "accident," in the context of insurance coverage, is "an unexpected happening without an intention or design." *Terre Haute First Nat'l Bank v. Pacific Employers Ins. Co.*, 634 N.E.2d 1336, 1338 (Ind.Ct.App. 1993). There, we found that a complaint against a bank, alleging negligence and breach of fiduciary duty in acting as a guardian, did not arise from an "accident" and thus was not the result of an "occurrence."[8] Rather, the claim against the bank arose from a professional relationship, and not from an accident. *Id.* Similarly, the economic losses alleged by the Association arise out of the contractual relationship of the Association and Thompson, and not from an "occurrence."

The construction of the terms "occurrence" and "accident" in the context of a CGL policy appears to be a question of first impression in Indiana, so we again turn to authorities elsewhere for guidance in interpreting these standard provisions. In *Hawkeye–Security Ins. Co. v. Vector Const. Co.*, 185 Mich.App. 369, 460 N.W.2d 329 (1990), the court addressed a CGL policy definition of "occurrence" similar to that in the Thompson policies.[9] Vector, the insured contractor, performed concrete work with

6. We noted in *Aetna* the insurer's contention that no claim had been made that the defective particle board had physically damaged Fleetwood's camper trailers, but rather that the trailers were less valuable because the defective materials were incorporated into them. Similarly, here, the Association did not allege in the underlying action that its buildings were physically damaged by the incorporation of the defective roofing materials into them. Instead, the Association was claiming damages in the form of its costs to repair, replace, or remedy the defective construction.

7. We acknowledge Thompson's argument that even if the Association's losses did not arise from an "occurrence," they are covered under separate Products Completed Operations Hazard provisions which do not require that the property damage result from an "occurrence." Because the losses at issue here were "economic" losses, and not "property damage," *see* n. 4, *supra*, we need not decide whether the Products Completed Operations Hazard provisions require an "occurrence."

8. The policy at issue defined "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in personal injury or property damage neither expected nor intended from the standpoint of the Insured." *Id.* at 1337–38.

9. The *Hawkeye* policy defined occurrence as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." 460 N.W.2d at 332.

concrete supplied to it by a subcontractor. The concrete failed to comply with specifications, so Vector had to remove 13,000 yards of concrete and pour new concrete. Hawkeye, Vector's insurer, denied coverage, and the trial court granted summary judgment for Hawkeye, holding that the defect in the concrete was not an "occurrence." The appellate court affirmed, finding there was no reasonable basis in the policy language for Vector to expect coverage for defective workmanship. *Id.*, 460 N.W.2d at 334.

In *Indiana Insurance Co. v. Hydra Corp.*, 245 Ill.App.3d 926, 185 Ill.Dec. 775, 615 N.E.2d 70 (1993), the court also found that an alleged breach of contract with a third party was not an "occurrence" as contemplated by a CGL policy. Hydra contracted to build an industrial building for a third party. It was sued after cracks appeared in the concrete floor, and the exterior of the building became unsightly because of loose paint. The trial court found Indiana Insurance had no duty to defend Hydra, and the appellate court affirmed. The court noted that the natural and ordinary consequences of an act are not an "accident," *id.* at 778, 615 N.E.2d at 73, and characterized the cracking floors and peeling paint as "the natural and ordinary consequences of installing defective concrete flooring and applying the wrong type of paint." *Id.*

Similarly, the degradation of the fire-resistant plywood used as roof decking in the Sandpiper units was also the natural and ordinary consequence of the work done by Thompson or under its supervision. The process of "acid hydrolosis" which degraded the plywood was the result of increased temperature, inadequate ventilation, and moisture accumulation in the attic area because the roof systems were installed without proper ventilation. R. at 951–56.

Like the actions in *Indiana Insurance* and *Vector*, the Association's action against Thompson is one for breach of contract arising from faulty workmanship and design, and from use of defective materials. Furthermore, the economic losses suffered by the Association are the natural and ordinary consequences of Thompson's breach. Because a typical CGL policy "does not cover an acci-

dent of faulty workmanship but rather faulty workmanship which causes an accident," *DeZutti*, 408 N.E.2d at 1279, (quoting *Weedo*, 405 A.2d at 796), the Association's losses did not arise from an "occurrence" and are not covered by Thompson's CGL policies.

### CONCLUSION

The Association's action against Thompson does not involve "property damage" which was the result of an "accident," and the CGL policies do not provide coverage for the Association's economic losses. The trial court correctly entered summary judgment in favor of Monroe and Commercial Union, and its judgment is affirmed.

DARDEN and RUCKER, JJ., concur.