RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0021p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

THE CINCINNATI INSURANCE COMPANY,
  *Plaintiff-Appellee,*

  *v.*

BEAZER HOMES INVESTMENTS, LLC et al.,
  *Defendants-Appellants.*

No. 08-5967

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 05-00470—Karl S. Forester, District Judge.

Argued: November 30, 2009

Decided and Filed: February 4, 2010

Before: BATCHELDER, Chief Judge; SILER and GILMAN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Martin M. McNerney, KING & SPALDING LLP, Washington, D.C., for Appellants. Kimberly A. Kyle, KOHNEN & PATTON, LLP, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Martin M. McNerney, KING & SPALDING LLP, Washington, D.C., Michael M. Raeber, Jessica E. Sabbath, KING & SPALDING LLP, Atlanta, Georgia, Jaron P. Blandford, McBRAYER, McGINNIS, LESLIE & KIRKLAND PLLC, Lexington, Kentucky, for Appellants. Kimberly A. Kyle, K. Roger Schoeni, KOHNEN & PATTON, LLP, Cincinnati, Ohio, for Appellee.

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit Judge. The Cincinnati Insurance Company (CIC) sued Beazer Homes Investments, LLC in a declaratory-judgment action to establish that CIC was not obligated to cover the costs that Beazer incurred in repairing water damage to several houses that Beazer had built as the general contractor. The damage was allegedly caused by faulty workmanship on the part of Beazer's subcontractors. CIC's motion for

judgment on the pleadings was granted by the district court, which held that the damage at issue was not "property damage" caused by an "occurrence" as defined in Beazer's insurance policies with CIC. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A.     Factual background

From 1998 to 2002, Crossmann Communities, Inc. was the general contractor for the construction of houses in the Beaumont Subdivision near Lexington, Kentucky. Subcontractors performed all or most of the actual construction work. During this time, Crossmann entered into a series of commercial general liability (CGL) insurance policies with CIC (the Policies). The Policies generally covered the "ultimate net loss" that Crossmann was legally obligated to pay because of "property damage" caused by an "occurrence." Crossmann merged into Beazer in 2002, and Beazer became the successor-in-interest to Crossmann's insurance policies.

After the Beaumont houses were completed and sold, several homeowners complained of damage as a result of water intrusion into their homes. The homeowners claimed that the damage was the result of faulty workmanship by Crossmann and/or its subcontractors.

### B.     Procedural history

After Beazer began investigating and repairing the damage, it submitted a claim to CIC, seeking coverage for the costs incurred in making the repairs. Beazer specifically sought reimbursement for the costs of repairing properly constructed components of the houses that had been damaged by the water intrusion, which in turn had been caused by the faulty construction of other components. In response, CIC sought a declaratory judgment holding that it was not liable for such costs. Beazer filed an answer and counterclaim, seeking a declaratory judgment that CIC was obligated to cover the costs of repair. CIC subsequently filed a motion for judgment on the pleadings.

The parties agreed in the district court that Indiana law governs their dispute and the interpretation of the Policies. In March 2008, the district court granted CIC's motion, holding that (1) the judgment in a prior South Carolina lawsuit between the parties did not estop CIC from contesting whether Beazer's costs were covered by the Policies under Indiana law, (2) the damage at issue was not "property damage," and (3) the damage was not caused by an "occurrence."

Shortly thereafter, Beazer filed a motion for reconsideration, which was denied. Beazer also filed motions to supplement the record both in the district court and in this court, claiming that it had newly discovered evidence that CIC had taken contrary positions on various matters in parallel litigation in a federal district court in Indiana. A prior panel of this court denied the motion, but did so without prejudice to our reconsideration of the issue. Beazer has timely appealed.

## II. ANALYSIS

### A.          Standard of review

A motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure may be granted where the moving party "is entitled to judgment as a matter of law." *Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 526 (6th Cir. 2006) (citation omitted). When deciding such a motion, the district court must take all the "well-pleaded material allegations of the pleadings of the opposing party" as true. *Id*. (citation omitted). This court reviews a grant of judgment on the pleadings de novo. *Id.*

### B.          Collateral estoppel

As an initial matter, Beazer argues that the district court erred in permitting CIC to contest whether the Policies cover the damage at issue. In 2007, a South Carolina state court issued a declaratory-judgment ruling against CIC and in favor of Beazer, interpreting South Carolina law to hold that water damage to properly constructed parts of a house, which was caused by faulty construction on other parts of the house, was property damage caused by an occurrence under Beazer's policies with CIC. *See Crossmann Cmtys. of N.C., Inc. v. Harleysville Mut. Ins. Co.*, No. 2004-CP-2600084 (S.C. Ct. Com. Pl., May 3, 2007). The

policies at issue in *Harleysville* are the same as those in the instant case, but the damaged properties are located in different states. Beazer argues that CIC is prevented by the doctrine of collateral estoppel from relitigating whether the Policies cover the damage because another court has previously ruled on this issue.

Collateral estoppel "bars subsequent relitigation of a fact or issue where that fact or issue was necessarily adjudicated in a prior cause of action" between the same parties or their privies, but is appropriate only where the "precise issue" in the subsequent case was raised and litigated in the prior proceeding. *Cobbins v. Tenn. Dep't of Transp.*, 566 F.3d 582, 589 (6th Cir. 2009). The question is therefore whether the *Harleysville* court decided the same issue as that presented in the instant case.

Over thirty years ago, the United States District Court for the Eastern District of Michigan articulated a definition of an "issue" for the purposes of collateral estoppel that was praised by a leading treatise on federal law:

> An issue is a single, certain and material point arising out of the allegations and contentions of the parties. It may concern only the existence or non-existence of certain facts, or it may concern the legal significance of those facts. If the issues are merely evidentiary, they need only deal with the same past events to be considered identical. However, if they concern the legal significance of those facts, the legal standards to be applied must also be identical; *different legal standards as applied to the same set of facts create different issues.*

*Overseas Motors, Inc. v. Import Motors Ltd.*, 375 F. Supp. 499, 518 n.66a (E.D. Mich. 1974) (emphasis added) (citations and internal quotation marks omitted), *aff'd*, 519 F.2d 119 (6th Cir. 1975), *quoted in* 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4417 n.2 (2d ed. 2002) (describing the definition of an "issue" in *Overseas Motors* as "[a]s good an effort as any"). Beazer characterizes the relevant issue in *Harleysville* as whether "the Policies covered the damage to the homes because it was 'property damage' caused by an 'occurrence.'" But that is too broad a reading of the *Harleysville* decision. The issue in that case was not whether the Policies covered the damage under some universal insurance law, but whether the damage was covered under *South Carolina* insurance law. In the present case, the issue is whether such damage is covered under *Indiana* insurance law.

Collateral estoppel does not bar the relitigation of issues where the legal rules governing a specific case or issue are different. 18 Wright, Miller & Cooper, *Federal Practice and Procedure* § 4425 (2d ed. 2002) ("Identity of the issue is established by showing that the same general legal rules govern both cases and that the facts of both cases are indistinguishable as measured by those rules. Preclusion should not apply if there has been a change either in the facts *or the governing rules*.") (emphasis added).

In *Boomer v. AT&T Corp.*, 309 F.3d 404, 422 n.10 (7th Cir. 2002), for example, a class of AT&T customers argued that AT&T was collaterally estopped from arguing that the arbitration clause in its service contract was valid. Another class had previously brought suit against AT&T in a federal court in California, and that court found the clause to be unconscionable and therefore unenforceable under California law. When the second class sued AT&T in federal court in Illinois, the Seventh Circuit refused to apply collateral estoppel to AT&T's defense because the issue in the second suit was whether the clause was valid under *Illinois* law. *See id.* ("In [the prior case], the question of unconscionability involved California law, whereas in this case it involves Illinois law, and therefore the issues are not the same."); *see also Sw. Pet Prods., Inc. v. Koch Indus., Inc.*, 32 F. App'x 213, 215 (9th Cir. 2002) (holding that collateral estoppel did not bar the litigation of an issue under Arizona law where California law was applied in the prior suit, because the issues were not "identical"); *Guild Trust v. Union Pac. Land Res. Corp.*, 682 F.2d 208, 211 (10th Cir. 1982) (denying the application of collateral estoppel, in part, because the law applied in the prior case was Colorado property law and the law governing the case before the court was Wyoming property law); *Peterson v. Clark Leasing Corp.*, 451 F.2d 1291, 1292 (9th Cir. 1971) (per curiam) (holding that collateral estoppel did not apply in a case where the issue was whether financial records were inadequate under federal law, and a prior case had determined that the records were inadequate under California law, even though "these inquiries are likely very similar"); *475342 Alberta, Ltd. v. Starfire*, No. 95-2083-GTV, 1996 WL 370221, at *3 (D. Kan. June 19, 1996) (denying collateral estoppel where a prior court had applied Oklahoma and California contract law to the issue, but Kansas law applied in the subsequent case, stating that "[b]ecause the law of different states applies, this court is not presented with an identical issue").

This rule of law has been applied within the Sixth Circuit as well.  In *Quixtar Inc. v. Brady*, Nos. 08-14346, 08-14347, 2008 WL 5386774 (E.D. Mich. Dec. 17, 2008), the district court refused to apply collateral estoppel with regard to the enforceability of an arbitration clause.  Quixtar had brought suit against several of its distributors, seeking to enforce the mandatory arbitration clause contained in its distributor contracts.  *Id*. at *1.  A different set of distributors had previously brought suit in a federal court in Texas against Quixtar and, on appeal, the Fifth Circuit found that the arbitration provision was unenforceable under Texas law.  *Id*. at *4.

The *Quixtar* court held that the prior decision by the Fifth Circuit did not collaterally estop Quixtar from asserting the validity of the arbitration clause because the parties had agreed that Michigan law governed their dispute.  Like Beazer in the current case, the distributors in *Quixtar* had attempted to broadly define the issue previously decided, claiming that the relevant issue decided by the Fifth Circuit and to be decided by the Michigan court was "the enforceability of the arbitration provisions." *Id*. at *5.  The *Quixtar* court, however, rejected this broad definition.  Instead, it defined the issue as whether "these provisions were unenforceable **under Texas law**." *Id*. (emphasis in original).

> Not surprisingly, the Fifth Circuit expressed no view . . . as to whether Quixtar's arbitration provisions might be unenforceable under the law of Michigan (or any state other than Texas). It readily follows, then, that the "precise issue" to be decided here—namely, the enforceability of Quixtar's arbitration provisions under Michigan law . . . was not raised and litigated before the Fifth Circuit . . . .

*Id*.

This rule applies with equal force in insurance cases.  In *Evanston Insurance Co. v. Affiliated FM Insurance Co.*, 556 F. Supp. 135 (D. Conn. 1983), one insurance company (Evanston) sought a declaratory judgment that a second insurance company (Affiliated) was liable for primary indemnification and the defense of the insured.  The contested issue was which insurer was the primary insurer in light of the conflict between Affiliated's occurrence-based policy and Evanston's claims-made policy.  Two years prior to the decision in *Evanston*, a federal court in Pennsylvania had held that Affiliated's occurrence-based policy (which was identical to the policy at issue in *Evanston*) made it the primary

insurer where there was a conflict with a claims-made policy.  Evanston argued that the issue could not be relitigated in Connecticut because collateral estoppel applied.  The district court in Connecticut rejected this argument, however, because the prior case had been decided under Pennsylvania state law.  Because the question in *Evanston* was how *Connecticut* courts would rule on the issue of conflicting occurrence-based versus claims-made policies, the issues raised were not "identical" and collateral estoppel did not apply.  *Id*. at 137.

A district court in Massachusetts reached the same result in *Stop & Shop Cos. v. Federal Insurance Co.*, 946 F. Supp. 99 (D. Mass. 1996), *rev'd on other grounds*, 136 F.3d 71 (1st Cir. 1998).  There, a district court in California had previously decided that an insurance policy provided coverage for losses that clients of an accountant had suffered when the accountant diverted millions of dollars that the clients had entrusted to the accountant to pay to the Internal Revenue Service.  *Id*. at 105.  When Stop & Shop, another client of the accountant, sued for a declaratory judgment that the same insurance policy provided it with coverage for identical losses, Stop & Shop contended that the insurer was precluded from arguing that its policy did not provide coverage given the previous determination in California.  The district court in Massachusetts, however, denied the use of collateral estoppel because California state law was used to resolve the prior dispute, and Massachusetts state law governed the later dispute.  *Id.* at 106.

Beazer responds by citing *Aaron v. Mahl*, 674 S.E.2d 482 (S.C. 2009), for the proposition that even if Indiana and South Carolina courts might interpret the Policies differently, collateral estoppel still applies.  In that case, Mahl's former employer brought suit against her in a California state court for various causes of action and won a judgment of damages.  *Id*. at 483-84.  Mahl's employer then assigned the California judgment to an individual named Jim Aaron, who filed suit in both Indiana and South Carolina state courts to enforce the judgment.  The Indiana court enforced the judgment, specifically rejecting Mahl's argument that the assignment was invalid.  Subsequently, a South Carolina trial court found the assignment to be invalid and refused to enforce the judgment. But the South Carolina Supreme Court reversed, holding that res judicata and collateral estoppel applied to require the South Carolina trial court to enforce the California judgment of damages and the Indiana holding that the assignment was valid.  *Id*. at 485-87.

*Aaron* is distinguishable from the present case for two reasons. First, nowhere in the *Aaron* opinion is there any suggestion that the law applied in California and Indiana differed from the law to be applied by the South Carolina courts. The two issues in *Aaron*—liability giving rise to the judgment and the validity of the assignment—had thus already been decided, so the South Carolina trial court erred when it reanalyzed these issues. Here, the issue of coverage under Indiana law has not been previously determined. Second, *Aaron* was ultimately about the enforcement of a judgment, and a final judgment, unlike a matter of contract interpretation under a different set of laws, is entitled to full faith and credit under the U.S. Constitution. *See Hosp. Underwriting Group, Inc. v. Summit Health Ltd.*, 63 F.3d 486, 494-95 (6th Cir. 1995) (holding that the district court's failure to enforce a judgment of damages from an Arizona state court because it viewed the damages as excessive violated the Full Faith and Credit Clause of the U.S. Constitution, which requires "federal courts to give full faith and credit to the judicial proceedings of state courts"). Collateral estoppel is thus not applicable to the instant case, and CIC is free to contest whether the Policies cover the costs that Beazer incurred.

**C.     Property damage caused by an occurrence**

Turning now to the merits, Beazer sought coverage not for repair of the faulty work by the subcontractors, but for damage to *other* components of the houses caused by water intrusion that resulted from the allegedly faulty workmanship. The district court held that such damage was neither property damage nor caused by an occurrence under Indiana law, and thus was not covered by the Policies. Beazer argues that these conclusions are erroneous or, in the alternative, that Indiana law on this issue is not settled, thus prompting its request that we certify the question to the Indiana Supreme Court.

### 1.     *Property damage*

The Policies define property damage as "[p]hysical injury to or destruction of tangible property including all resulting loss of use." Applying Indiana law, the district court held that each completed house in its entirety is the work of Beazer and that damage to the contractor's own work is not property damage under the Policies.

The first Indiana case to squarely address this issue was *R.N. Thompson & Associates, Inc. v. Monroe Guaranty Insurance Co.*, 686 N.E.2d 160 (Ind. Ct. App. 1997). There, a home builder sought coverage for the costs of repairing damage "arising from inadequate materials and substandard construction work." *Id.* at 161. (The definitions of property damage and occurrence contained in the Policies in the instant case are virtually identical to the definitions in *R.N. Thompson* and the various other cases discussed in this Opinion.) Because the damage was limited to the builder's own work, the court held that such damage was not property damage as defined by the builder's CGL insurance policy:

> The great weight of . . . authority is to the effect that CGL policies cover the possibility that the goods, products, or work of the insured, once relinquished or completed, will cause bodily injury or damage to property *other than* to the product or completed work itself, and for which injury or damage the insured might be exposed to liability. The coverage is for tort liability for physical damages to others, and not for contractual liability of the insured for economic loss suffered because the completed work is not what the damaged person bargained for.

*Id*. at 162 (emphasis in original).

Other Indiana cases have adopted this reasoning. In *Amerisure, Inc. v. Wurster Construction Co.*, 818 N.E.2d 998 (Ind. Ct. App. 2004), for example, the court denied coverage to a general contractor that was seeking reimbursement for repairs made to the houses that it had built. Faulty exterior and insulation systems, which were installed by subcontractors, caused the damage. The court found that such damage was not property damage because "CGL policies cover the risk of damage to property *other than* the project itself." *Id*. at 1004 (emphasis in original). Because Wurster did not allege damage to "any person or property, *other than* these interconnected systems on the buildings being constructed by [the general contractor]," there was no property damage. *Id*. (emphasis in original).

The court in *Amerisure* followed the same reasoning as the court in *R.N. Thompson*:

> The construction of CGL insurance contracts . . . is based upon two types of risk arising from a contractor's work. The first, business risk, is a result of not performing well (i.e., faulty work) and is borne by the contractor in order to satisfy its customers. The second type of risk is occurrences which give

> rise to insurable liability. These occurrences are accidental injury to persons or property due to faulty workmanship. In other words, a business risk arises when, for example, a craftsman applies stucco to . . . a home in a faulty manner and discoloration, peeling and chipping result, [where] the poorly-performed work must be repaired or replaced by the contractor. On the other hand, should the stucco peel and fall from the wall, and thereby cause injury to the homeowner or his neighbor . . . or to a passing automobile, an occurrence of harm arises which is covered under a CGL policy.

*Id*. at 1003 (citations and internal quotation marks omitted).

Similarly, in *Sheehan Construction Co. v. Continental Casualty Co.*, 908 N.E.2d 305 (Ind. Ct. App. 2009), *vacated*, No. 49A02-0805-CV-420, SC No. 49S02-1001-CV-32 (Ind. Jan. 14, 2010), the homeowners sued a general contractor after their homes were damaged by water intrusion, which was caused by the subcontractors' faulty work on various components of the houses. The court held that such damage was not property damage as defined in CGL policies because the builder did not claim any damage to property "other than the structural components of the homes themselves." *Id*. at 307-08 (citation omitted).

Beazer seeks to distinguish these prior cases by arguing that they involved repairs only to the faulty components themselves, not the properly constructed parts of the houses that were damaged as a result of the faulty components. But even if this is a factually accurate reading of the prior caselaw, the distinction ignores the holding of the Indiana Supreme Court that the entire house is the general contractor's work. *See Ind. Ins. Co. v. DeZutti*, 408 N.E.2d 1275, 1280 (Ind. 1980) (holding that "the entire project or house which he built and sold" is the product and work of the general contractor). Beazer, in other words, cannot successfully argue that damage to a properly constructed component of a house due to faulty workmanship on another component is "property damage" under a CGL policy.

Other courts applying Indiana law have similarly rejected this argument. *See Trinity Homes LLC v. Ohio Cas. Ins. Co.,* No. 1:04-cv-1920-SEB-DML, 2009 WL 3163108, at *6 (S.D. Ind. Sept. 25, 2009); *Westfield Ins. Co. v. Sheehan Constr. Co.*, 580 F. Supp. 2d 701, 711 (S.D. Ind. 2008), *aff'd*, 564 F.3d 817 (7th Cir. 2009). These federal cases, together with the Indiana state cases of *R.N. Thompson*, *Amerisure*, and *Sheehan*, clearly hold that a general contractor cannot claim CGL insurance coverage for the costs it incurs in repairing

houses that are subsequently damaged due to the faulty workmanship of its own subcontractors.

Beazer, however, relies on one of the Policies' exclusions in arguing to the contrary. The "your work" provision excludes coverage for damage to "work performed by [the policyholder] or on [its] behalf." But the exclusion does not apply "if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor." Beazer argues that the interpretation of "property damage" adopted by the Indiana courts renders superfluous the Policies' "your work" exclusion and that exclusion's subcontractor exception.

Unfortunately for Beazer, the Indiana Supreme Court has rejected the concept that exclusion clauses can be interpreted to enlarge coverage. *See DeZutti*, 408 N.E.2d at 1278. In *DeZutti*, the insurance policy specifically excluded coverage for "liability assumed by the insured under any contract or agreement." *Id*. at 1277. The exclusion had an exception, however, for "a warranty of fitness or quality of the named insured's products or a warranty that work performed by or on behalf of the named insured will be done in a workmanlike manner." *Id*. DeZutti argued that the exception "must grant or extend coverage to breach of contract damages for the performance of work in a negligent and unworkmanlike manner." *Id*. at 1278. The Court rejected this argument because such logic ignored the fundamental tenet of insurance law that "exclusion clauses do not grant or enlarge coverage." *Id*.

But Beazer argues that *DeZutti*'s reliance on a policy exclusion to deny coverage actually supports its position that the damage at issue is covered property damage. DeZutti was a general contractor for a set of houses and was assisted in the actual construction by various subcontractors. The homeowners discovered problems with the foundation and sued the general contractor, who then sought coverage for the cost of repairs from his insurance company. The Court first stated that the general insuring clause, which covered property damage caused by an occurrence, "would seemingly provide coverage" for the damages. *Id*. at 1277. Next, however, the Court analyzed a set of exclusions, and held that an exclusion that eliminated coverage for "property damage to work performed by [you]" meant that the damage at issue was not covered. *Id*. at 1278-79. The Court then outlined its reasoning,

using the same business risk/tort liability risk distinction relied on by the intermediate Indiana courts in *R.N. Thompson*, *Amerisure*, and *Sheehan*:

> [T]he two risks involved are quite different and the costs attendant upon the repair or replacement of the insured's own faulty work is part of every business venture and is a business expense to be borne by the insured-contractor in order to satisfy customers. It is a business risk long excluded by comprehensive liability policies. Another form of risk . . . is injury to people and damage to other property caused by the contractor's negligence or defective product. It is this risk which the policy in question covers.

*Id.*

Beazer submits that because the Indiana Supreme Court resorted to looking at the exclusions in the policy in *DeZutti*, rather than rejecting coverage based on the meaning of property damage alone, it would find coverage in the instant case. But the court in *R.N. Thompson* explicitly rejected this argument. *See R.N. Thompson*, 686 N.E.2d at 163 n.4 ("We recognize that . . . *DeZutti* defined the scope of the CGL coverage in part by addressing exclusions to the policies . . . . However, the [business-risk/tort-risk] reasoning has led courts to the same result without reliance on the policy exclusions."); *see also Sheehan*, 908 N.E.2d at 309 n.3 (rejecting the argument that the "your work" exclusion and subcontractor exception demonstrates that damage to the contractor's own work is covered property damage, reasoning that "[i]f the insuring clause does not extend coverage, 'one need look no further'") (quoting *Amerisure, Inc.*, 818 N.E.2d at 1005).

The United States District Court for the Southern District of Indiana, when faced with nearly identical facts as those in the instant case, has similarly concluded that Indiana law interprets property damage as covering only damage to property other than the finished houses. As recently as September 2009, that court ruled that costs incurred by a general contractor in repairing properly constructed components of a house, which were damaged by faulty subcontractor work on other components, were not covered under the Policies because the damage was not CGL property damage:

> [I]t is clear that the cost of repairing faulty workmanship is not deemed "property damage" if the damaged property is limited to the project itself. . . . Therefore, the insured seeking coverage must demonstrate that some property other than the project itself—that is to say, something other

than the homes constructed by [the general contractors] and their subcontractors—was damaged.

*Trinity Homes LLC*, 2009 WL 3163108, at *6 (citations omitted); *see also Westfield Ins. Co.*, 580 F. Supp. 2d at 711 (holding that, under Indiana law, "damage to the otherwise non-defective parts of the houses damaged by faulty workmanship" does not constitute property damage).

Given the clear line of cases discussed above, there is no need to certify this issue to the Indiana Supreme Court. "Resort to the certification procedure is most appropriate when the question is new and state law is unsettled." *Transamerica Ins. Co. v. Duro Bag Mfg. Co.*, 50 F.3d 370, 372 (6th Cir. 1995). The Indiana Supreme Court has clearly made a distinction between the two types of risks facing a builder. *See DeZutti*, 408 N.E.2d at 1279 ("The same neglectful craftsmanship may cause both a business expense of repair and a loss represented by damage to persons and property other than the insured's own product or work. If . . . the damage is confined to the insured's own work, it is a business risk and expense not intended to be covered under the policy."). Several decisions by both state and federal courts in Indiana have applied this reasoning to come to a consistent view that damage to houses caused by faulty workmanship by subcontractors is not considered property damage under CGL policies. *See Trinity Homes LLC*, 2009 WL 3163108, at *6 n.10 ("Indiana courts have adopted clear and controlling precedent governing the issues in this case.").

We recognize that the Indiana Supreme Court recently granted transfer in *Sheehan v. Continental Casualty Co.*, 908 N.E.2d 305 (Ind. Ct. App. 2009), to decide whether the type of damage at issue in the instant case is property damage caused by an occurrence under the terms of CGL policies. This action clearly obviates the need for us to certify the same issue. Moreover, the law in Indiana is relatively settled as to whether such damage is property damage for CGL insurance purposes unless and until the Indiana Supreme Court decides otherwise. *See Transamerica Ins. Co.*, 50 F.3d at 372 (declining to certify an issue for resolution by the Kentucky Supreme Court where Kentucky law was "relatively settled" on the issue). The district court therefore did not err in holding that, under Indiana law,

Beazer's repair costs were not covered by its Policies with CIC. Nor did it err in declining to certify the issue to the Indiana Supreme Court.

We would note, by the way, that our decision and the decisions of multiple Indiana courts that such damage is not encompassed by the property-damage definition in standard CGL policies does not leave general contractors without any protection against the risk in question. General contractors can require performance bonds, can contract for professional-liability insurance or subcontractor-default insurance, or can seek breach-of-contract damages against subcontractors who do not adequately perform. *See* 4A Philip L. Bruner & Patrick J. O'Connor, Jr., *Construction Law* §§ 12:13 (professional bonds); 11:118 (professional-liability insurance); 11:130 (subcontractor-default insurance); and 18 (breach of contract) (2009). These costs can thus be covered through other legal avenues, but are not covered by the standard CGL policy as interpreted under Indiana law.

### 2. *Occurrence*

The district court also concluded that the damage to the houses was not caused by an "occurrence." The Policies define an occurrence as "[a]n accident, including continuous or repeated exposure to substantially the same general harmful conditions." The district court reasoned that

> even if Crossmann and/or its subcontractors were negligent in building the houses and did not intend a defective result, the act itself of building the houses was intentional and cannot be considered accidental conduct under the policies. Further, any damage to the non-defective components of the houses was also the natural and ordinary consequence of the faulty work . . . and therefore not an "accident."

Given the conclusion that the damage at issue was not property damage under the Policies, the question of whether the damage was caused by an occurrence is a moot point. Several Indiana courts, however, have agreed with the district court's conclusion and held that the natural consequences of intentional acts are not accidents. In *Jim Barna Log Systems Midwest, Inc. v. General Casualty Insurance Co. of Wisconsin*, 791 N.E.2d 816 (Ind. Ct. App. 2003), for example, the purchasers of a log-home package sued the distributor for various causes of action, including negligently hiring a contractor with insufficient experience, after their home was inadequately constructed. The distributor sought coverage

from its insurer, but the court held that no accident was involved because the act of hiring the contractor was intentional, "[e]ven if [the distributor] acted negligently or carelessly by hiring" the contractor. *Id*. at 826; *see also R.N. Thompson*, 686 N.E.2d at 165 (holding that degradation of the roofing materials was the "natural and ordinary consequence of the work done by [the general contractor] or under its supervision" and therefore was not an accident); *Amerisure, Inc.*, 818 N.E.2d at 1005 ("[C]onsistent with . . . *R.N. Thompson* as well as the majority of jurisdictions outside our state, we hold that defective workmanship that results in damages only to the work product itself is not an occurrence.").

The Indiana Supreme Court has also applied the business-risk/tort-risk distinction to determine whether a loss is caused by an accident. When an alarm company sought coverage for a wrongful-death judgment against it, which flowed from a case alleging that the alarm company had unreasonably delayed reporting an incident, the Court held that the damages were not an insurable loss because they did not flow from an accident as defined in the CGL policy. *Tri-Etch, Inc. v. Cincinnati Ins. Co.*, 909 N.E.2d 997, 1002-03 (Ind. 2009). It reasoned that "[t]he CGL policy does not guarantee the quality of work or products of its insured," and that "[c]laims based on negligent performance of commercial or professional services are ordinarily insured under 'errors and omissions' or malpractice policies. For this reason, CGL policies typically exclude claims arising out of professional or other business services." *Id*. at 1001-02. Indiana courts would therefore likely agree with the district court's conclusion that the damage here was not caused by an occurrence.

## D.     Fungus exclusion

In its opinion, the district court also noted CIC's argument that a fungus exclusion in the policies precludes coverage. The court then stated that it was unnecessary to address this argument given its conclusion about the scope of the insuring clause, but stated that it was "of the opinion" that such a fungus exclusion would exclude coverage in the instant case. Beazer argues that the court erred in considering the alleged exclusion because Beazer disputed that the Policies actually contained the fungus exclusion. On appeal, CIC has not contested Beazer's argument on this point.

Because of the factual dispute, the district court should have accepted Beazer's allegation as true and analyzed the Policies as if they did not contain the exclusion. *See Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 526 (6th Cir. 2006) ("For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true." (citation omitted)). This error on the part of the district court was harmless, however, for two reasons. First, the reference to the alleged exclusion was dicta because the court did not rely on the exclusion in denying coverage. Second, as discussed above, Indiana courts would deny coverage in the instant case based on their interpretation of the terms "property damage" and "occurrence" regardless of any fungus exclusion.

**E.     Record on appeal**

Beazer's final argument relates to its effort to expand the record on appeal, having filed motions to expand both in this court and in the district court. A motions panel of this court denied Beazer's request, but did so without prejudice to our reconsideration of the issue. Beazer seeks to supplement the record with evidence from the *Trinity Homes* litigation, *see Trinity Homes LLC*, 2009 WL 3163108, alleging that the evidence would establish that CIC has admitted that the Policies do not contain a fungus exclusion and that the damage at issue is property damage caused by an occurrence.

The evidence about the fungus exclusion is irrelevant in light of the fact that the district court did not rely on it in denying coverage. As for the other evidence that would allegedly establish that Beazer's costs are covered by the Policies, Beazer seeks to supplement the record from two sources. It first cites the deposition testimony of an underwriting representative from CIC to the effect that the Policies do not make a distinction between damaged real property and damaged personal property, which was in response to hypothetical questions about various types of damage that a house can sustain. Next, Beazer relies on answers in CIC's responses to Beazer's requests for admissions that the Policies' definitions of property damage and occurrence do not distinguish between damage to a house, damage to a component of a house, or damage to personal property. CIC's responses, however, went on to explain that although the policy definitions do not distinguish between

these types of damage, Indiana courts clearly interpret CGL policies with such distinctions in mind.

We see no justification for adding these materials to the record on appeal. "[A] court of appeals has discretionary authority to supplement the record with material not reviewed by the district court in special circumstances." *United States v. Murdock*, 398 F.3d 491, 499 (6th Cir. 2005). One of the factors that a court should consider in exercising this discretion is "whether proper resolution of the case was beyond any dispute." *Id*. at 500. In light of the line of Indiana cases discussed in this Opinion, we believe that the proper resolution of this case is clear.

Moreover, this proffered evidence is hardly an incontrovertible admission by CIC that the type of damage at issue in both *Trinity Homes* and the instant case was property damage caused by an occurrence. The alleged admissions were either in response to hypothetical questions or were expressly limited by reference to various Indiana cases. Indeed, the court in *Trinity Homes* ultimately concluded that the damage was *not* covered by the Policies, even after being presented with such evidence. We therefore decline to exercise our discretion to permit Beazer to expand the record at this late date.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.